**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

FILED

U.S. DISTRICT COURT
EAST. DIST. MICH.
BAY CITY

Oct 14  4 34 PM '03

MICHELLE ALBERTS,

      Plaintiff,

v.

MOTION INDUSTRIES, Inc.,

      Defendant.

_____/

CASE NO. 02-CV-10163-BC

DISTRICT JUDGE DAVID M. LAWSON
MAGISTRATE JUDGE CHARLES E. BINDER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. 55)

## I.    RECOMMENDATION

For the reasons stated herein, **IT IS RECOMMENDED** that the motion be **GRANTED.**

## II.    REPORT

### A.    Introduction

Defendant's motion for summary judgment was referred to the undersigned Magistrate Judge by U.S. District Judge David M. Lawson in an order of reference filed pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 108.) This employment discrimination case was originally filed in Saginaw County Circuit Court in Saginaw, Michigan, and was removed to this Court in

119

June 2002 on diversity grounds. Plaintiff claims that her former employer, Defendant Motion Industries, Inc. (hereafter "Motion Industries" or "Defendant"), reduced her hours and ultimately terminated her employment in violation of her rights under Michigan law. Specifically, Plaintiff's complaint asserts claims of pregnancy discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2101 *et seq.*; retaliation in violation of the Elliott-Larsen Civil Rights Act; and violation of Michigan's Minimum Wage Act, MICH. COMP. LAWS § 408.394.

On February 14, 2003, Defendant filed the instant motion for summary judgment, a memorandum in support, and two appendices. (Dkts. 55, 56, 61 & 62.) On May 5, 2003, Plaintiff filed her response in opposition to the motion (Dkt. 101), and on May 15, 2003, Defendant filed its reply. (Dkt. 105.) A hearing was held on June 19, 2003. Accordingly, the motion is ready for Report and Recommendation.

### B.      Factual Background and Plaintiff's Allegations

On September 5, 2000, Plaintiff Michelle Alberts began working for Defendant Motion Industries in the area of Inside Sales. Motion Industries is a wholesale distributor of industrial bearings and fluid, mechanical, electrical and power transmission components. It has branches located in Saginaw, Michigan, where Plaintiff worked, in Lansing, Michigan, and in several other Michigan cities. On January 19, 2001, Plaintiff received her first Employee Performance Evaluation from her immediate supervisor, Operations Manager Tracy Garcia ("Garcia"). Plaintiff received a "Fair" performance rating in the category of

Job Understanding and was told that her product knowledge needed work.[1]  Home study courses were recommended.  She received "Satisfactory" ratings in Job Performance and Job Productivity, and "Good" ratings in Attendance and Attitude.  (Employ. Perform. Eval., Dkt. 101 at Ex. 1.)

Plaintiff alleges that on April 4, 2001, she informed Garcia that she was pregnant. Plaintiff asserts that less than one month later, on May 1, 2001, she was told that her hours were being cut in half from 40 per week to 20 per week.  On June 1, 2001, Plaintiff's new 20-hour-per-week schedule began.  (Employ. Status Change Form, Dkt. 101 at Ex. 8.)

On June 11, 2001, Plaintiff was issued a First Written Warning by Garcia.  The warning stated that Plaintiff's product knowledge was not increasing satisfactorily and that study courses were a minimum requirement.  Weekly meetings between Plaintiff and Garcia were instituted so that Plaintiff's performance could be evaluated on a weekly basis. (Written Warning, Dkt. 101 at Ex. 2.)

On June 26, 2001, Plaintiff was issued a Second Written Warning citing several specific examples of "unsatisfactory behavior or performance": failing to charge freight on eleven separate occasions; failing to interchange orders to lower cost material to increase profit as instructed; processing an order on credit from a customer who was only allowed C.O.D. deliveries; and misquoting prices to customers.  Plaintiff signed the written warning, which stated that one more occurrence would result in Plaintiff's termination.  (Written

---

[1]The five-level rating scale used for the evaluation was as follows: unsatisfactory, fair, satisfactory, good, excellent.

Warning, Dkt. 101 at Ex. 3.)  Plaintiff claims that later in the day on June 26, 2001, the same day she received the second warning, she called the Michigan Department of Civil Rights ("MDCR") to discuss filing a claim of pregnancy discrimination.  On July 2, 2001, the pregnancy discrimination claim was actually filed with the MDCR.  On July 26, 2001, Plaintiff's employment was terminated.

In her complaint, Plaintiff alleges that her hours were cut in half and she was discharged because of her pregnancy, which violated her rights under Michigan's Elliott-Larsen Civil Rights Act.  Plaintiff also claims that once Defendant Motion Industries learned that she had filed a claim with the MDCR, they retaliated against her by firing her, which was also in violation of that Act.  Plaintiff further claims that her rights under Michigan's Minimum Wage Act were violated because while she worked at Motion Industries she was required to spend many hours studying at home and she was not compensated for this time.  She also claims that, pursuant to the Michigan Minimum Wage Act, she should have been compensated for the weekends she was on-call because she was required to stay within 20 minutes of the office which drastically infringed on her right to enjoy the weekends in the way she wanted.

## C.     Motion Standards

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, and will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  All facts and inferences must be viewed in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In responding to a motion for summary judgment, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 191 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court may rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has made clear that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role

equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson,* 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.

### D.      Pregnancy Discrimination Claim

### 1.      Governing Law

Employment discrimination on the basis of sex is prohibited by Michigan law. Pursuant to Michigan's Elliott-Larsen Civil Rights Act ("the Act"), an employer may not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex . . . ." MICH. COMP. LAWS § 37.2202(1)(a). "Sex," as the term is defined in the Act, "includes, but is not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth . . . ." MICH. COMP. LAWS § 37.2201(d). Michigan law, therefore, prohibits "pregnancy discrimination." *See Dep't of Civil Rights ex rel. Peterson v. Brighton Area Schools,* 171 Mich. App. 428, 437, 431 N.W.2d 65 (1988) ("because pregnancy is a condition unique to women, any distinction drawn on the basis of pregnancy denies women valuable rights solely on account of their sex").

To establish a claim of pregnancy discrimination in employment, a plaintiff may either proffer direct evidence of discrimination or rely on circumstantial evidence to provide an inference of discrimination. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462, 628 N.W.2d 515 (2001). Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).

Under Michigan law, if a plaintiff alleging employment discrimination fails to present direct evidence of discrimination, a defendant's motion for summary judgment is analyzed by utilizing the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Hazle,* 464 Mich. at 462.

Under the first phase of the *McDonnell Douglas* framework, a plaintiff has the burden of establishing a "prima facie case" of discrimination by presenting evidence that he or she was: "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct," *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695, 568 N.W.2d 64 (1997), or, in the case of termination, "that the plaintiff was replaced by one who was not a member of the protected class." *Smith v. Goodwill Industries of West Michigan, Inc.*, 243 Mich. App. 438, 447, 622 N.W.2d 337 (2001).

When a plaintiff establishes a prima facie case of discrimination, a rebuttable presumption of discrimination is created, and the burden then shifts to the employer to identify a legitimate non-discriminatory reason for its employment decision. *Hazle,* 464 Mich. at 464. The defendant's burden, however, is one only of production, because the plaintiff at all times retains the burden of proof in a discrimination case. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). "Once the defendant produces such evidence, even if later refuted or disbelieved, the presumption drops away, and the burden of proof shifts back to plaintiff." *Lytle v. Malady*, 458 Mich. 153, 174, 579 N.W.2d 906 (1998). To survive summary judgment, the plaintiff then has the burden of proving "by a preponderance of admissible direct or circumstantial evidence, that there was a triable issue that the employer's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Id.*

### 2.      Direct Evidence of Discrimination

In this case, Defendant asserts that Plaintiff has no direct evidence of pregnancy discrimination. Plaintiff, on the other hand, claims that she overheard Tracy Garcia talking on the phone saying that she would hire Tasha Hemphill, a temporary worker at Motion Industries, on a full-time permanent basis, but not until after she completed her maternity leave. Plaintiff claims that this statement provides direct evidence of pregnancy discrimination. (Dkt. 101 at 7.)

Defendant responds that Plaintiff has taken this statement which she overheard totally out of context, and that it provides absolutely no direct evidence of discrimination. Tracy

Garcia explains in her declaration that Motion Industries wanted to hire Tasha Hemphill, a female employee who had been placed with them by a temporary employment agency, on a full-time permanent basis, but the agency required that she not be formally hired as a permanent Motion employee until her maternity leave was completed. (Garcia Decl. at ¶ 17.) Garcia states that Plaintiff must have overheard her referring to this situation during a phone call, and misunderstood the statement. Defendant asserts that this statement, once placed in context, provides no evidence of discrimination, and points out that Plaintiff admitted in her deposition that she had no knowledge of the context of the statement or the phone call. Because Plaintiff also acknowledged that this lone statement by Garcia was Plaintiff's only purported direct evidence of discrimination, Defendant argues that Plaintiff fails to survive summary judgment on the basis of direct evidence. (Dkt. 105 at 2.)

Under Michigan law, courts are to consider the following factors when determining whether statements constitute direct evidence of discriminatory animus or are merely "stray remarks":

> (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision.

*Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 194 n.8 (2003) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994); *Krohn v. Sedgwick James, Inc.*, 244 Mich. App. 289, 292, 624 N.W.2d 212 (2001)).

In this case, although the statement was made by a decision-maker within the scope of her employment, I suggest that it was so isolated and ambiguous that it cannot be said to provide direct evidence of discriminatory bias against pregnant women in Defendant's employment practices. Put another way, it is not evidence which "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn*, 176 F.3d at 926. I therefore suggest that Plaintiff has failed to present sufficient direct evidence of pregnancy discrimination to survive the motion for summary judgment on that basis.

### 3.   Indirect Evidence – *McDonnell Douglas* Burden-Shifting Test

As mentioned, when a plaintiff fails to present direct evidence of discrimination, the Court must apply the *McDonnell Douglas* burden-shifting test to determine whether the plaintiff's claim of discrimination survives summary judgment.

### a.   Prima Facie Case

The first step requires Plaintiff to establish a prima facie case of employment discrimination by presenting evidence that she was: "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) that others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct," *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695, 568 N.W.2d 64 (1997), or, in the case of termination, "that the plaintiff was replaced by one who was not a member of the protected class." *Smith v. Goodwill Industries of West Michigan, Inc.*, 243 Mich. App. 438, 447, 622 N.W.2d 337 (2001). When analyzing these elements, it must be remembered

that the prima facie requirement of the *McDonnell Douglas* test "is not onerous," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), and poses "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).

### i.      First Element: Plaintiff was a Member of a Protected Class

In this case the "protected class" is that of pregnant women, and no one disputes that Plaintiff was in fact pregnant. However, Defendant argues that, according to the deposition testimony of Tracy Garcia, the decision was made to reduce Plaintiff's hours in February or March 2001, and at that time Defendant did not know that Plaintiff was pregnant, as she did not inform Garcia of her pregnancy until April 4, 2001. Citing *Johnson v. Northwest Airlines*, 839 F. Supp. 1253, 1259 (E.D. Mich. 1993), for the proposition that if an employer doesn't know that an employee is a member of a protected class, they cannot possibly intentionally discriminate against the employee for belonging to the class, Defendant asserts that this element is therefore not met with regard to the reduction in Plaintiff's hours. (Def.'s Mem., Dkt. 56 at 13.) Defendant acknowledges, however, that it knew Plaintiff belonged to a protected class when Plaintiff's employment was terminated.

Plaintiff counters that the evidence demonstrates that Defendant did know of Plaintiff's pregnancy at the time her hours were reduced. Plaintiff points to a document entitled "Motion Industries Employee Status Change Form," indicating the change in Plaintiff's job classification from "Full Time Inside Sales" to "20 hours per week," which was described on the form as "Part Time Inside Sales <less than 32 hours>." (Dkt. 101 at Ex. 8.) The form provides that the "effective date" of the change was June 1, 2001, and the

"Approvals" section bears the signature of Gary Moore and the date of May 30, 2001. At
that time, Gary Moore was employed as the branch manager of Motion's Lansing and
Saginaw branches, and in that capacity was Tracy Garcia's immediate supervisor. (Moore
Dep., Dkt. 62, Ex. C. at 3.) Plaintiff argues that, according to the following passage from
Gary Moore's deposition, Plaintiff's reduction in hours was not a "done deal" until May 30,
2001, when the Status Change Form was signed and approved:

> Q.   And could her hours have been changed without your approval?
>
> A.   No.
>
> Q.   You're the final arbiter of how many hours any person is authorized to work?
>
> A.   I would say that's not true.
>
> Q.   Who's the final arbiter?
>
> A.   For the inside staff it's Tracy.
>
> Q.   Did she need your approval?
>
> A.   There's an approval line. I sign it as the branch manager.
>
> Q.   Did she need your approval or could she have done it without your approval?
>
> A.   To cut her hours?
>
> Q.   Yes, sir.
>
> A.   She needed my approval.
>
> Q.   So it wasn't a done deal until you signed the agreement, correct?
>
> A.   That's correct.
>
> Q.   And you affixed your approval on May 30th?

A.     Yes.

Q.     At that point you knew that Ms. Alberts was pregnant?

A.     Boy, the time frame's in there, but I would assume I did.

(Moore Dep. at 62 (objections as to form of questions omitted).)  Plaintiff therefore asserts

that she has satisfied this element of her prima facie case, because there is no dispute that she

informed Defendant of her pregnancy on April 1, 2001, and the evidence shows that the

decision to reduce her hours was not final until almost two months later on May 30, 2001.

Considering the Supreme Court's admonishment in *Burdine* that the burden of

establishing a prima facie case is not an onerous one, I suggest that Plaintiff's argument

prevails and that, even if Garcia and Moore discussed the option of reducing Plaintiff's hours

in February or March of 2001, the record evidence demonstrates that the final decision was

actually made on May 30, 2001, weeks after Defendant knew that Plaintiff was a member of

the protected class of pregnant women.

### ii.     Second Element:  Plaintiff Suffered an Adverse Employment Action

To meet this element, a plaintiff must show:  (1) that the action taken was materially

adverse in that it was more than mere inconvenience or an alteration of job responsibilities;

and (2) that there is an objective basis for demonstrating that the change is adverse.

*Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich. App. 347, 364, 597 N.W.2d 250

(1999).  Examples of materially adverse actions include:  termination, demotion, decrease

in wages, less distinguished job title, and material loss of benefits.  *Id.* at 363 (quoting *Kocsis

v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

Plaintiff's complaint does not specify what actions taken by Defendant are alleged to be "adverse employment actions." The relevant portion of the complaint states:

> 6.     After plaintiff informed defendant she was pregnant, the conditions of her employment changed substantially, all to her detriment.
>
> 7.     The adverse employment action taken by defendant against plaintiff resulted, in whole or in part, from plaintiff's pregnancy, all in violation of the Elliott-Larsen Civil Rights Act.

(Compl. at ¶¶ 6-7.)

Defendant asserts that the two written warnings do not rise to the level of adverse employment actions, and therefore the only adverse actions are the reduction in hours and the termination, and Defendant acknowledges that it took these two adverse employment actions against Plaintiff. Plaintiff apparently agrees with this assessment, stating in her response to Defendant's motion that Defendant cannot dispute that "she suffered an adverse employment action, first by having her hours halved and next by being fired." (Dkt. 101 at 8.)

Accordingly, I suggest that this element of the prima facie case is met as to these two actions.

### iii.     Third Element: Plaintiff was Qualified for the Position

In *Town*, *supra*, the Supreme Court of Michigan set out the standard for determining whether an employee is qualified for his position. The *Town* court stated, "[a]n employee is qualified if he was performing his job at a level that met his employer's legitimate expectations." *Town*, 455 Mich. at 699. When determining whether Plaintiff has made the required showing on this element, however, it is inappropriate for a court to rely on the

defendant's evidence of a legitimate non-discriminatory reason for its adverse action as a basis for finding the plaintiff's prima facie case inadequate. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). "This is true even if that 'production' evidence happens to show that, in the employer's view, the plaintiff was not meeting its legitimate expectations for the position at issue." *Id.*

In this case, Defendant contends that Plaintiff has not satisfied this element of her prima facie case because she cannot show that she was performing to her employer's satisfaction either at the time of the reduction in hours or the termination. Defendant points out that, prior to the reduction in hours, Plaintiff received a written Employee Performance Evaluation describing her knowledge of the job as merely "fair," and that this rating was justified by the customer complaints Tracy Garcia received regarding Plaintiff. (Dkt. 56 at 14.) Defendant also points out that, prior to her termination, Plaintiff received two formal written warnings documenting her failure to satisfactorily handle customer requirements and failure to follow company directives, she was specifically counseled regarding the aspects of her performance which needed improvement, and she was warned that a lack of improvement would result in her termination. (Dkt. 56 at 21-22.) These assertions, however, are the same justifications given as Defendant's legitimate non-discriminatory reasons for reducing Plaintiff's hours and ultimately terminating her employment, and therefore they may not be considered at this point in the analysis because "whether or not a plaintiff makes a prima facie case must be ascertained by weighing the plaintiff's evidence that she was

meeting her employer's legitimate expectations, not by considering the nondiscriminatory reasons produced by the defendant as its reason for terminating her." *Cline*, 206 F.3d at 662-63.

Plaintiff asserts that she was qualified for the position, and in support points to the same 90-day Employee Performance Evaluation as Defendant, but focuses on the categories of "Job Performance," "Job Productivity," and "Overall Rating," for which she received "Satisfactory" ratings, and the categories of "Attendance" and "Attitude" for which she was given even higher ratings of "Good." (Emp. Perf. Eval. dated Jan. 19, 2001, Dkt. 101 at Ex. 1.) Plaintiff also argues that an inference of satisfactory work performance can be derived from the lack of any negative documentation in her personnel file between the January 19, 2001, evaluation and her first Written Warning on June 11, 2001, which occurred after she announced her pregnancy and after her hours had been reduced. (Dkt. 101 at 8-9.)

Considering only the evidence highlighted by Plaintiff, I suggest that Plaintiff has demonstrated that she was qualified for the position as that term is defined by the case law. The fact that Plaintiff's overall rating in her first evaluation was "satisfactory" certainly seems to be convincing evidence in Plaintiff's favor. Moreover, although Plaintiff received one "poor" rating, it would be unrealistic for an employer to expect new employees to receive outstanding ratings in all categories of their initial evaluations. Finally, the comments written by Tracy Garcia on the January 2001 evaluation indicate that she had hope that, with the proper training and education, Plaintiff could progress into an extremely productive

employee.[2]  Accordingly, I suggest that Plaintiff has satisfied her burden on this element of the prima facie case.

      iv.    **Fourth Element: Others Similarly Situated & Outside the Protected Class Were Unaffected by the Employer's Adverse Conduct or Plaintiff Was Replaced by One Who Was Not a Member of the Protected Class**

In this case it is undisputed that Plaintiff was not replaced (*see* Garcia Decl. at ¶ 23), so in order to satisfy this element Plaintiff must show that others who were similarly situated and outside of the protected class were not subjected to the same adverse action. With regard to Plaintiff's hours being reduced from 40 per week to 20 per week, Defendant asserts that this action was taken pursuant to a regional reduction in force, and that no similarly situated employees who were not pregnant received more favorable treatment than Plaintiff.  In support, Defendant points to the declaration and deposition of Gary Moore, the branch manager, who explained that in March 2001 the regional manager instructed each branch in Michigan to reduce monthly expenses by $6,000. (Moore Decl., Dkt. 62, Ex. J at ¶ 4; E-mail dated March 15, 2001, to Moore from Jim Randazzo, Regional Manager, attached to Moore Decl.)  Moore states that he discussed the matter as it related to the Saginaw branch with Tracy Garcia, the operations manager there, who recommended that Plaintiff's hours be reduced because "[s]he was the newest employee and at that time the least productive." (Moore Dep. at 58.)  Moore agreed, and they concluded that no further reductions were

---

[2]In the comments section of the evaluation, Garcia wrote the following:

Product knowledge needs to be worked on.  Home study courses MRC/SKF, Boston, C/R. This would help increase productivity, cut down on some error, & also be more at ease dealing with customers.  Customers would trust her more & she could build a client base.

(Dkt. 101 at Ex. 1.)

required at that branch because another employee by the name of Jodi Wellington had recently resigned and the remainder of the reduction in branch expenses could be met by not replacing Ms. Wellington. (Moore Decl. at ¶ 6.) To meet the reduction in branch expenses at the Lansing branch, four male employees' hours were reduced from 40 hours per week to 32 hours per week. (*Id.*)

With regard to Plaintiff's termination, Defendant argues that Plaintiff cannot meet this element of the prima facie case because she cannot demonstrate either that she was replaced by a person outside of the protected class or that any similarly situated employees outside of the protected class were treated more favorably than Plaintiff, who received two written warnings describing the specific areas where improvement was needed prior to her ultimate termination when that improvement did not occur. (Dkt. 56 at 22.) In support of this argument, Defendant points to the declaration of Tracy Garcia, who avers that the only other employee regarding which she received customer complaints was also issued a written warning (*see* Garcia Decl., Dkt. 62, Ex. A at ¶ 13; Written Warning to Jodi Wellington, Dkt. 62, Ex. A1), and that other non-pregnant employees at the Saginaw branch have been terminated in the past for poor job performance without first being issued warnings or any type of progressive discipline. (Garcia Decl. at ¶ 14.)

Plaintiff's response in opposition to Defendant's motion does not address this element of the prima facie case, other than to quote *Town* for the proposition that Plaintiff merely has to demonstrate that others outside the protected class who were similarly situated were unaffected by the employer's adverse conduct. (Pl.'s Br. in Opp., Dkt. 101 at 9.) In

responding to a defendant's motion for summary judgment, a plaintiff has the burden of presenting "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When a plaintiff fails to do so, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court may rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). Plaintiff here has not pointed to any evidence, significant or otherwise, in an attempt to meet this element of her prima facie case. I do note, however, that in the section of Plaintiff's brief arguing pretext, Plaintiff asserts that the fact that four male employees at the Lansing branch only had their hours cut to 32 per week, while Plaintiff's hours were cut in half, demonstrates pretext. (Dkt. 101 at 11.) Giving Plaintiff the benefit of the doubt that she assumed that this discrepancy between the Lansing cuts and the cut to Plaintiff's hours satisfied the prima facie case requirement, I will address that issue.

Defendant contends that the treatment of the four male employees in Lansing cannot be compared to that of Plaintiff, because they were not "similarly situated" to Plaintiff. (Dkt. 56 at 14.) To establish that the four male Lansing employees were "similarly situated," Plaintiff must show that "'all of the relevant aspects' of [her] employment situation were 'nearly identical' to those of [the Lansing employees'] employment situation." *Town*, 455 Mich. at 700 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). *See also Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992) ("to be

deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it")[3]; *Neason v. General Motors Corp.*, 2003 WL 193534 (Mich. Ct. App. Jan. 28, 2003) (unpublished) (finding that an employee who used a weapon in a fight at work cannot be

---

[3]I note that the Sixth Circuit has held that the *Mitchell* court's definition of "similarly situated" does not apply to claims of pregnancy discrimination brought under the federal Pregnancy Discrimination Act ("PDA"), because the PDA expressly provides "additional protection" for pregnant women. *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996). The instant case, however, is not brought pursuant to the PDA, but rather under Michigan's Civil Rights Act, and the Michigan courts have clarified that the Michigan statute does not provide such additional protection:

> In response to the United States Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976), the Michigan Legislature amended the Civil Rights Act and the United States Congress amended Title VII of the Civil Rights Act of 1964. Both the Michigan Legislature and the Congress reacted to remedy the Supreme Court's decision, which held that Title VII of the Civil Rights Act did not prohibit discrimination based on pregnancy. However, the substance of the state and federal amendments were different. Michigan's amendment was a straightforward redefinition of the term "sex discrimination," which was clarified to include pregnancy and pregnancy-related conditions:
>
> > "Sex" includes, but is not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth that does not include nontherapeutic abortion not intended to save the life of the mother. [MCL 37.2201(d) (1978 PA 153, effective May 22, 1978).]
>
> By contrast, the 1978 congressional amendment of Title VII of the Civil Rights Act was more than a clarification. Unlike the 1978 amendment of the Michigan Civil Rights Act, the federal amendment, [known as the Pregnancy Discrimination Act or PDA], not only stated that sex discrimination included discrimination based on pregnancy and pregnancy-related conditions but further provided "women affected by pregnancy, . . . shall be treated the same for all employment-related purposes, . . . as other persons not so affected but similar in their ability or inability to work." 42 USC 2000e(k) (emphasis added).

*Cunningham v. Dearborn Bd. of Educ.*, 246 Mich. App. 621, 628-29, 633 N.W.2d 481 (2001) (citation and footnote omitted). Accordingly, the more strict test for whether one employee is "similarly situated" to another continues to apply to claims of pregnancy discrimination brought under the Michigan Civil Rights Act.

considered "similarly situated" to an employee who engaged in a fight at work but was unarmed); *Penna v. MGM Grand Detroit, L.L.C.*, 2002 WL 31947948 (Mich. Ct. App. Dec. 3, 2002) (unpublished) (affirming summary disposition for defendants where, "although plaintiff presented evidence of misconduct and absenteeism by other employees who were not members of the protected class and who were not discharged, plaintiff failed to demonstrate either that the positions and duties of these employees were nearly identical to hers, or that the alleged misconduct or absenteeism of these employees was of a similarly egregious nature to hers").

In this case, Plaintiff has failed to demonstrate that the positions or duties of the four male Lansing employees were nearly identical to hers, that any of the four Lansing employees had the least seniority at their branch as Plaintiff did, or that any of the four were being monitored by management for ongoing problems in the areas of product knowledge and customer service as Plaintiff was.   In fact, Plaintiff has presented no evidence whatsoever with regard to these four employees other than copies of their Employee Status Change Forms signed by Gary Moore reducing their hours from full time to "part time 32 hrs or more" effective May 16, 2001. (Dkt. 101 at Ex. 11.)

Accordingly, I suggest that because Plaintiff has not established that the four male Lansing employees were treated more favorably although they were "similarly situated in all respects," Plaintiff has failed to satisfy the burden of establishing a prima facie case of discrimination with regard to the reduction in her hours. With regard to her termination, I likewise suggest that Plaintiff has failed to meet the fourth element of the prima facie case

because she has presented no evidence to demonstrate that an employee of Defendant who was similarly situated and outside the protected class was treated more favorably than she was. Therefore, I suggest that the Court grant Defendant's motion for summary judgment.

### b.     Legitimate Non-Discriminatory Reasons

Although I suggest that Plaintiff has failed to meet her burden of demonstrating a prima facie case of employment discrimination, I will nevertheless proceed through the remaining steps of the analysis because, even if Plaintiff has established a prima facie case, I alternatively suggest that Defendant is nevertheless entitled to summary judgment because Defendant has articulated legitimate non-discriminatory reasons for the adverse employment actions taken against Plaintiff, and Plaintiff has failed to come forward with sufficient evidence to permit a reasonable trier of fact to conclude that the reasons given by Defendant are pretextual and that Plaintiff's pregnancy made a difference in the employment decisions.

With regard to Defendant's burden of producing legitimate non-discriminatory reasons for its adverse actions, a "defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Lytle v. Malady*, 458 Mich. 153, 173-74, 579 N.W.2d 906 (1998).

Defendant asserts that its legitimate non-discriminatory reason for cutting Plaintiff's hours was that a reduction in force was required, Plaintiff had the least seniority at the

Saginaw branch, and she was the least productive sales person in that office. (Dkt. 56 at 15.) Defendant further contends that its legitimate non-discriminatory reason for terminating her employment was that her performance in the areas of product knowledge and customer service did not improve even after repeated warnings. (*Id.* at 22.)

In support of these assertions, Defendant relies primarily on the declaration and deposition of Tracy Garcia. Garcia explains that during Plaintiff's first three months on the job, she observed that Plaintiff lacked a basic understanding of Motion's products and was not responding adequately to customer requests. (Garcia Decl., Dkt. 62, Ex. A at ¶ 9.) Garcia found this surprising in light of Plaintiff's prior work experience as a purchasing agent for two of Motion's customers. Garcia avers that during this time she counseled Plaintiff and offered assistance. (*Id.*) On January 19, 2001, when Garcia prepared Plaintiff's first Employee Performance Evaluation, she therefore gave Plaintiff a "Fair" rating in the category of "Job Understanding" and informed Plaintiff that her product knowledge needed work. Garcia also recommended home study courses to help Plaintiff in this area.

Garcia avers that she and several of Plaintiff's co-workers received complaints about Plaintiff's poor performance and lack of product knowledge from various customers. (Garcia Decl. at ¶ 10.) The co-workers' declarations to this effect are attached as exhibits to the motion. (Dkt. 62 at Exs. D-G). One Motion employee, Brian Chludil, explains that he was put in a difficult position "because, as an Outside Sales Person, I am frequently called away from the branch. Accordingly, I rely on Inside Sales Persons to assist in handling my accounts while I am away from the branch. Since Michelle Alberts did not provide adequate

assistance to my customers during my absence, I had to make sure that my other co-workers at the branch forwarded [customer's] calls to me personally (to avoid Michelle Alberts taking the calls) while also ensuring a timely response to the calls." (Brian Chludil Decl., Dkt. 62, Ex. E at ¶ 6.)  Mr. Chludil also avers that he informed Tracy Garcia each time he received a complaint from a customer.  (*Id.* at ¶ 8.)

Garcia states that during February and/or March of 2001, she received complaints regarding Plaintiff's performance from Bob Walters at Bay United Motors, who complained that Plaintiff's product knowledge wasn't up to par, and Brett Smith from Grey Iron who complained that Plaintiff was not responding in a timely manner.[4] (Garcia Dep., Dkt. 62, Ex.

---

[4]Plaintiff claims that these statements may not be considered by the Court on a motion for summary judgment because they consist of inadmissible hearsay evidence. The court in *Hanley v. Siemens Medical Solutions Heath Services Corp.*, No. 01-CV-71826-DT, 2003 WL 1119845 (E.D. Mich. Feb. 6, 2003), was recently confronted with the identical argument in a suit alleging *inter alia* pregnancy discrimination under Michigan law. The court in *Hanley* found the evidence to be admissible, reasoning:

> Plaintiff acknowledges that, due to financial losses, Defendant engaged in a reduction in force . . . and that one person from Jon Trigg's ten person staff would be terminated. Trigg testified that he selected Plaintiff as the person to be terminated because in his judgment, she was the poorest performer. The statements made by Tate, Santoro and Romzek[, three of Defendant's regional vice-presidents,] were statements about Plaintiff's performance that were either made to Trigg or were reported to Trigg. These statements were not offered, or received by the Court, for the truth of the matter asserted in such statements; rather, they were offered for their effect on the listener, Jon Trigg. Therefore, such statements are not hearsay. *See* Fed. R. Evid. 801(c). (*See also United States v. Pico*, 784 F.2d 798, 804, n.3 (7th Cir. 1986) ( "Certain statements, which evidence the effect of the statements on the mind of the listener, therefore, are not hearsay. 'Statements may . . . be admitted to show . . . states of mind such as knowledge, motive, fear, or reasonableness in taking particular action.'") (citation omitted).

*Hanley*, 2003 WL at *2 (cite to record omitted). The same result obtains here; the statements and complaints made to Tracy Garcia and Gary Moore regarding Plaintiff's performance are admissible under Federal Rule of Evidence 801(c) because they are offered to show the reasonableness of the subsequent employment actions taken by Garcia and Moore as agents of Defendant Motion Industries.

K at 56.) Gary Moore also states that he received complaints about Plaintiff from Malleable Iron during this time. (Moore Dep., Dkt. 62, Ex. C at 36.)

Garcia avers that in March 2001, when the regional manager directed that costs be cut by $6,000 per month at each branch, she and Gary Moore decided upon a reduction-in-force based upon seniority and performance to implement the cuts, and determined that Plaintiff had the least seniority and was the least productive. Garcia states that there was no need for any further cuts because another employee at the Saginaw branch had just quit and the decision was made to not replace that person, thus yielding further monthly savings. (Garcia Dep. at 136.)

In early June 2001, Garcia states that she received customer complaints about Plaintiff from the following customers: Eaton, Northern Tube, and M.E. Campbell. (Garcia Dep. at 60-64.) Garcia states that the buyer from Eaton, one of Motion's top customers, told her that he would not deal with Plaintiff again, and would take Eaton's business to a competitor if he couldn't get a different sales person assigned to the account. Garcia considered these complaints to be "very serious" and even "earth shattering." (*Id.* at 60.)

Based on these customer complaints, Garcia issued the First Written Warning to Plaintiff on June 11, 2001. The warning form stated that Plaintiff's product knowledge was not increasing, and that study courses were now a minimum requirement. (Dkt. 101 at Ex. 2.) It also specifically listed the three most recent complaints, by whom they were made, and explained that the potential consequences for not improving in these areas would be a "second written warning – then discharge." (*Id.*) Plaintiff signed the form, acknowledging

that the problems had been discussed with her and signifying her understanding that "either failure to improve or the occurrence of other incidents of unsatisfactory behavior/performance will result in further disciplinary action, up to and including discharge." (*Id.*) Weekly meetings between Garcia and Plaintiff were instituted to evaluate Plaintiff's performance on a more frequent basis.

A little over a week later, on June 19, 2001, Garcia states that she discovered an error by Plaintiff in quoting a price on a $5,000 order. (Garcia Dep. at 65-69.) Other problems with Plaintiff's performance continued, and on June 26, 2001, Plaintiff was issued a Second Written Warning. (Dkt. 101 at Ex. 3.) In this warning, the following specific examples of Plaintiff's poor performance were cited: failure to charge freight on eleven separate occasions; failure to interchange orders to lower cost material to increase profit; allowing a customer to place a charge order when the customer was allowed C.O.D. deliveries only; and misquoting prices to customers. Plaintiff again signed the warning, this time acknowledging that one more occurrence would result in termination. (*Id.*)

On July 10, 2001, Garcia met with Plaintiff to discuss two more customer complaints that had been lodged against her. (Pl.'s Dep., Dkt. 62, Ex. B at 134.) On July 13, 2001, Garcia discussed with Plaintiff a quote Plaintiff sent to a customer that didn't contain a price. (*Id.* at 136.) On July 16, 2001, Garcia learned that another customer, Merrill Tool, was upset because it had expressed to Plaintiff that it needed a part on an expedited basis, and yet Plaintiff ordered the part from another state, which meant that the customer had to wait longer to receive the item and had to pay additional shipping charges. (Garcia Dep. at 130.)

Finally, the incident that was considered the "last straw" occurred on July 24, 2001, when Plaintiff handled a part order from Jim Warheit of Brown Machine. Plaintiff informed Mr. Warheit that the part he wanted was obsolete and that his engineer would have to redesign the equipment. The following day, July 25, Plaintiff had the day off. Jim Warheit called Tracy Garcia to complain that his engineer said the part was definitely not obsolete. (Garcia Dep. at 28-30.) Garcia then checked Motion's stock, and not only was the part not obsolete, Motion had one in inventory and Plaintiff had just sold one to someone else the prior week. (*Id.* at 30-32.) Garcia reported this incident to Gary Moore, and the decision was made to terminate Plaintiff's employment after getting approval from the human resources department. On July 26, 2001, Moore and Garcia informed Plaintiff that her employment was terminated. Defendant points out that Plaintiff acknowledged in her deposition that Moore and Garcia told her that she was being terminated because of poor performance, customer complaints, and the failure to improve her performance despite prior counseling and discipline. (Pl.'s Dep. at 146.)

Plaintiff concedes that Defendant has met its burden of articulating legitimate non-discriminatory reasons for the adverse employment actions. (Dkt. 101 at 10.) Therefore, the rebuttable presumption of discrimination "drops from the case," *Burdine*, 450 U.S. at 255 n.10, and what remains is the issue of whether Plaintiff has produced sufficient evidence to survive the motion for summary judgment on the ultimate question of pretext. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).

### c.    Plaintiff's Burden to Show Defendant's Reason is Merely Pretext

Because Defendant has articulated legitimate non-discriminatory reasons for Plaintiff's reduction in hours and discharge, the burden shifts back to Plaintiff who must come forward with sufficient evidence to permit a reasonable trier of fact to conclude that the reasons given by Defendant are pretextual and that Plaintiff's pregnancy "made a difference" in the adverse employment decisions. *Hazle*, 464 Mich. at 466. The Michigan Supreme Court explained the standard of proof to be applied to a plaintiff's evidence at this stage of a summary judgment motion:

> [D]isproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for . . . sex discrimination. Therefore, we find that, in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.

*Lytle v. Malady,* 458 Mich. 153, 175-76, 579 N.W.2d 906 (1998) (footnote omitted). When making this determination, the soundness of the employer's business judgment may not be scrutinized as a means of showing pretext. *Meager v. Wayne State Univ.*, 222 Mich. App. 700, 565 N.W.2d 401 (1997).

Plaintiff claims that evidence of pretext "abounds" in this case. (Dkt. 101 at 10.) As mentioned, she first points to the fact that at the Lansing branch the reduction in force was spread over four employees, where at the Saginaw branch Plaintiff was chosen "to bear the entire brunt of reducing personnel costs . . . ." (*Id.* at 11.) Plaintiff asks the question, "[i]f

seniority and performance were the factor in Saginaw, why not in Lansing?" (*Id.*) Plaintiff,

however, goes no further than this; she makes no attempt to provide any *evidence* to show

that seniority and performance were *not* considered in Lansing. Plaintiff has not even put

evidence in the record as to the job titles of the four Lansing employees, let alone evidence

regarding their seniority or performance ratings. Without some evidence that these four

employees were similarly situated to Plaintiff, there is no basis from which to draw the

inference that Plaintiff was treated differently because of her pregnancy. Plaintiff's assertion

that the mere fact that there was a discrepancy between Lansing and Saginaw in the method

used to reduce branch expenses provides evidence of pregnancy discrimination fails to carry

the day, because it is nothing more than mere speculation. A party's speculation and

conjecture are insufficient to establish an issue of fact for trial. *Detroit v. GMC*, 233 Mich.

App 132, 139; 592 N.W.2d 732 (1998). *See also Sutherland v. Michigan Dep't of Treasury*,

___ F.3d ___, 2003 WL 22143303 (6th Cir. Sept. 8, 2003) (slip op.) (affirming summary

judgment because pretext allegations were based on "unsupported speculation").

Plaintiff next argues that evidence of pretext can be found in Defendant's own

"Returned Goods Authorization" ("RGA") log book. In the RGA log, Defendant keeps a

record of goods returned by customers. Each time a return occurs, several pieces of

information are recorded in the RGA log about that return, including the date of the return,

the customer name, the credit memo number, and the initials of the employee who took the

original order. (RGA Log, Dkt. 101 at Ex. 13.) Plaintiff has analyzed the data recorded in

the RGA Log for the time period beginning with Plaintiff's first employee evaluation

(January 2001) and ending with her termination (July 2001), and has found that only nine of the returns were from orders originally handled by Plaintiff. (Dkt. 101 at 10.) Plaintiff points out that other employees, such as Tracy Garcia herself, had more returns from their orders than Plaintiff did. Based on this data, Plaintiff argues that Defendant's own documentation shows that Plaintiff's performance was not less accurate than other salespersons, and is therefore evidence of pretext. (*Id.*)

I suggest, however, that this data does not provide any evidence of pretext because it is incomplete and therefore cannot be used to draw the inference that Defendant seeks to draw. Most notably absent from this data is the number of total orders taken during the relevant time period by each salesperson. For example, if Salesperson A took 1,000 orders during that time and had 30 returns, while Salesperson B took 300 orders and had 15 returns, the conclusion that Salesperson A was "less accurate" than Salesperson B because A had twice as many returns as B would be entirely false. Furthermore, in this case, Defendant's concerns with Plaintiff's performance did not center on excessive returns. From the performance evaluation and the warnings, it is evident that it was Plaintiff's lack of product knowledge, her inability to efficiently handle client questions and requests, and her lack of initiative to "learn her craft" that led to the adverse actions. (*See* Written Warning dated June 26, 2001, Dkt. 101 at Ex. 3.) For these reasons, I suggest that the statistical fact that Plaintiff had fewer returns than other salespersons does not provide evidence that Defendant's purported reasons for adverse action were a mere pretext for discrimination.

Plaintiff also points to another statistical conclusion she has drawn, this time from Purchase Orders and Shipping Orders she subpoenaed from Brown Machine, one of Defendant's customers. Brown Machine kept a record each time they returned items to Defendant Motion Industries. Plaintiff has analyzed these records for the ten and one-half month period Plaintiff was employed by Defendant (September 5, 2000, through July 26, 2001) and for a seven and one-half month period prior to Plaintiff's employment (January 1, 2000, through August 16, 2000). Plaintiff states that the records show that the "ordering accuracy" was actually higher during the time Plaintiff handled the Brown Machine account. Specifically, Plaintiff claims that during the period prior to Plaintiff's employment, Brown returned 6% of the items it ordered, but during the time of Plaintiff's employment, Brown only returned 4% of the items. Plaintiff claims that this "objective analysis" shows that Plaintiff was not committing the errors that Garcia and Moore attributed to her.

I find that this data is entitled to little, if any, weight for several reasons. First, in drawing her conclusion, Plaintiff fails to take into consideration the fact that there are a "great variety of reasons" why products are returned. (Warheit Dep., Dkt. 62, Ex. H at 14.) In his deposition, Mr. Warheit cited the following possible reasons: an item could have been damaged in shipping, it could have been the wrong size, it could have been "inoperable after we put it on a machine," or it could have been just the wrong item altogether. (*Id.* at 16-17.) Therefore, to say that Brown's return of 2% fewer items during the time Plaintiff worked for Defendant was attributable to Plaintiff's performance and therefore provides evidence of pretext would be illogical. Second, as already mentioned, the problem with Plaintiff's

performance as articulated by Garcia, Moore, and other Motion employees wasn't that she generated too many returns. Third, although Mr. Warheit could not remember the specific incidents that occurred one and a half years prior to his deposition, he clearly recalled his dissatisfaction with the service he received from Plaintiff:

Q.   How would you describe [Plaintiff's] performance, Mr. Warheit?

A.   Marginal.

Q.   Was she proactive?

A.   Not particularly.  That was one of the problems.

Q.   Was she responsive in terms of addressing your needs?

A.   Not to the degree that we expected.

Q.   Would you describe her as passive?

A.   To some degree.

Q.   Did you feel that her performance did not fit in with the performance of other employees that you dealt with at Motion Industries?

A.   Yes.

     . . . .

Q.   I believe you referenced earlier at some point in time while you were experiencing these problems during June or July of 2001 you asked to have somebody else service your account?

A.   Yes.

(Warheit Dep. at 41, 44.)

These statements by Mr. Warheit are also relevant to Plaintiff's next assertion of pretext.  Plaintiff contends that two of the customers whom Defendant claims threatened to

take their business elsewhere if they had to keep working with Plaintiff, Jim Warheit of

Brown Machine and Dan Gruszynski of Northern Tube, specifically denied ever making such

statements in their depositions. (Dkt. 101 at 11.) Plaintiff, however, makes no cite to the

record as to where or when Defendant made such a claim. In Defendant's memorandum in

support of its motion for summary judgment, counsel for Defendant never attributed such

statements to Mr. Warheit or Mr. Gruszynski. Rather, that statement was attributed to Mr.

Mike Greko of Eaton. (Def.'s Mem. in Supp., Dkt. 56 at 6.) With regard to Warheit and

Gruszynski, Defendant only claimed that these customers requested that Plaintiff be removed

from their accounts. As quoted above, Warheit acknowledged making such a request. As

to Gruszynski, he recalled the problems[5] he had when he dealt with a certain female inside

sales person at Motion, although he could not remember her name, and he recalled that he

talked to his outside sales person about the situation and they decided that from then on he

would always ask for Tracy or Andy when placing a phone order. (Gruszynski Dep., Dkt.

62, Ex. I at 20.) After he began asking for Tracy or Andy, he had no more problems with his

orders. (*Id.* at 21.) I therefore do not find any evidence of pretext in these statements as

compared to Defendant's motion papers.

Finally, Plaintiff claims that the "last straw" incident regarding Jim Warheit and the

mistaken information about the obsolete part was merely "window dressing," and that it is

her belief that Garcia and Moore had already decided to terminate her employment prior to

---

[5]Mr. Gruszynski explained: "I never got what I was thinking I was going to get.  It was the wrong part.  Or when I called I would have difficulty in getting a response back, information back in a time period that I needed to – under the pressures of getting the machine fixed or whatever." (Gruszynski Dep., Dkt. 62, Ex. I at 16.)

that incident. Plaintiff bases this belief on the fact that it was a Wednesday when Garcia found out about the obsolete part situation, and it was the next day, Thursday, that Plaintiff was discharged. However, Plaintiff claims that their weekly meetings were always held on Tuesdays, and that week no Tuesday meeting occurred. Plaintiff claims that the clear inference from this fact is that Garcia and Moore had already decided to fire her, and the obsolete part incident that arose on Wednesday was merely "window dressing," which is further evidence of pretext. (Dkt. 101 at 13-14.)

Regarding this "window dressing" argument, I first note that Plaintiff admits that the "obsolete part" incident occurred, although she claims that it was not her fault that she gave erroneous information to Mr. Warheit because, when she checked the Motion Industries computer system that Tuesday, it indicated that the part was not in stock, and further, when she contacted the representative for the manufacturer of the part at issue, he is the one who told her that the part was obsolete, even though it wasn't. Second, I note that the documents provided by Plaintiff in support of her motion also undercut her argument. Plaintiff has attached what she characterizes as "minutes" of the weekly meetings, as prepared by Tracy Garcia.[6] The three documents are dated June 19, 2001, July 3, 2001, and July 18, 2001. (Dkt. 101 at Ex. 4.) While two of these dates fell on Tuesdays, one of them, July 18, 2001, was a Wednesday, and interestingly, it was the Wednesday of the week prior to the week when Plaintiff was discharged. Plaintiff claims that the fact that no weekly meeting occurred on Tuesday, July 24, 2001, is evidence of pretext, but I find that argument extremely tenuous

---

[6] Tracy Garcia repeatedly stated during her deposition that these were not "minutes" of the meetings, but merely notes she jotted down regarding various topics she wanted to discuss with Plaintiff.

34

considering that the meetings were not always held on Tuesdays and, as to the Tuesday in question, a week had not yet passed since the last meeting.

At this stage of the analysis, Plaintiff's burden is not only to provide evidence to disprove Defendant's articulated reasons for reducing her hours and terminating her employment, but also to raise a triable issue of material fact that discriminatory animus against pregnant women was a motivating factor underlying Defendant's employment decisions. *Lytle,* 458 Mich. at 175-76. Defendant points out that Plaintiff has not and cannot disprove that customers and other Motion employees complained about Plaintiff's poor performance. (Dkt. 105 at 4.) Likewise, Defendant notes that Plaintiff has not and cannot point to other similarly-situated non-pregnant employees who were treated differently, nor can she refute Tracy Garcia's deposition testimony that Defendant retained in its employment other pregnant employees, including Tracy Garcia herself. In the end, Defendant argues that Plaintiff has nothing other than her "subjective belief" that her pregnancy was a factor in Defendant's employment decisions, which is insufficient to survive summary judgment.

Viewing all of the arguments and evidence presented by Plaintiff on the issue of pretext as a whole, and making all inferences therefrom which are reasonable, I suggest that Plaintiff has failed to meet her burden, because she has neither offered evidence which disproves Defendant's articulated reasons for reducing her hours and terminating her employment, nor has she raised a triable issue of material fact that discriminatory animus against pregnant women was a motivating factor underlying Defendant's employment

decisions.  Accordingly, I suggest that Defendant is entitled to summary judgment on the claim of pregnancy discrimination.

### E.      Retaliation Claim

In addition to her claim of pregnancy discrimination, Plaintiff also alleges a claim of retaliation in violation of the Elliott-Larsen Civil Rights Act for exercising her right to file a complaint against Defendant with the Michigan Department of Civil Rights. (Compl. at ¶ 10.)

### 1.      Governing Law

Under Michigan Complied Laws § 37.2701, an employer is prohibited "from retaliating against an employee for making a charge, filing a complaint, testifying, assisting, or participating in an investigation, proceeding, or hearing under the [Elliott-Larsen Civil Rights] Act." MICH. COMP. LAWS § 37.2071.  The *McDonnell Douglas* burden-shifting framework applies to retaliatory discharge actions.  *Roulston v. Tendercare, Inc.*, 239 Mich. App. 270, 280-81, 608 N.W.2d 525 (2000).  Therefore, Plaintiff bears the initial burden of establishing a prima facie case of retaliatory discharge. *Id.*  To establish a prima facie case of retaliation, a plaintiff must show (1) that he or she engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 436, 566 N.W.2d 661 (1997).

2.     **Analysis and Conclusion**

In this case, Defendant concedes that Plaintiff has met the first three elements of the prima facie case, but argues that she cannot show that there was a causal connection between the protected activity and the adverse employment action. (Dkt. 56 at 24-25.) "To satisfy the causation requirement, the plaintiff must show that the participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not merely a causal link between the two." *Barrett v. Kirtland Community College*, 245 Mich. App. 306, 315, 628 N.W.2d 63 (2001). Defendant argues that it has presented sufficient evidence to demonstrate its legitimate reasons for terminating Plaintiff's employment, and that Plaintiff improperly relies solely on the temporal proximity between the filing of her charge with the MDCR on July 2, 2001, and her discharge on July 26, 2001, as evidence of retaliation. (Dkt. 56 at 25.)

Plaintiff responds by arguing that she "was discharged within a month of reporting her claim of pregnancy discrimination to the Michigan Department of Civil Rights. This proximity, together with the evidence of pretext discussed hereinbefore, is more than sufficient to establish the prima facie case." (Dkt. 101 at 15.) Plaintiff further asserts that "Michigan has long held that close temporal proximity between the adverse employment action and protected activity may establish the causal connection element of a prima facie case of retaliation." (*Id.* at 14-15.) Although Plaintiff cites several cases in support of her assertion, the Michigan Supreme Court recently ruled that:

> Although the employment actions about which plaintiff complains occurred
> after his report to the police, such a temporal relationship, standing alone, does

not demonstrate a causal connection between the protected activity and any adverse employment action.  Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed.

*West v. General Motors Corp.*, 469 Mich. 177, 665 N.W.2d 468, 472-73 (2003).

In this case, Plaintiff asserts that the "something more" consists of her arguments made to demonstrate pretext with regard to the pregnancy discrimination claim.  For the reasons explained in the previous section, however, those arguments are unavailing.  Accordingly, all that remains here is mere temporal proximity which the Michigan Supreme Court has found not to be sufficient.  I therefore suggest that Plaintiff has failed to establish a prima facie case of retaliatory discharge, and that Defendant's motion for summary judgment on this claim should be granted.

### F.    Claim of Violation of Michigan's Minimum Wage Law

Plaintiff's final claim is that "Defendant's failure to compensate plaintiff for her 'on call' time and/or study time is a violation of the Minimum Law [sic] of 1964, MCLA 408.381, *et seq*."  (Compl. at ¶ 16.)

Defendant asserts that it is entitled to summary judgment on this claim because it is not subject to the Michigan Minimum Wage Law ("MMWL").  The MMWL provides that it "does not apply to an employer who is subject to the minimum wage provisions of the Fair Labor Standards Act . . . ."  MICH. COMP. LAWS § 408.394.

The Fair Labor Standards Act ("FLSA") in turn provides that it applies to "enterprise[s] engaged in commerce or in the production of goods for commerce" and defines such to include an enterprise that "has employees handling, selling, or otherwise working on

38

goods or materials that have been moved in or produced for commerce by any person" and

"whose annual gross volume of sales made or business done is not less than $500,000 . . . ."

29 U.S.C. § 203(s)(1)(A). *Zorich v. Long Beach Fire Dept. and Ambulance Service, Inc.*, 118

F.3d 682, 684 (9th Cir. 1997).

Defendant asserts and the record evidence establishes that Defendant meets the definition of an enterprise engaged in commerce as defined by the FLSA,[7] and therefore Defendant is not subject to the Michigan Minimum Wage Law. Accordingly, I suggest that Defendant is entitled to summary judgment on the claim brought against it pursuant to the MMWL, and because this is Plaintiff's final claim, I further suggest that the case be dismissed with prejudice.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir.

---

[7]The record shows that Brown Machine alone does approximately $400,000 of business with Defendant annually. (Warheit Dep., Dkt. 62, Ex. H at 39.)

1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.


CHARLES E. BINDER
United States Magistrate Judge


DATED: October 14, 2003


Copies to:   Edward B. Davison, GAULT DAVISON, Tenth Floor Northbank Bldg, 432 N. Saginaw Street,
             Flint, MI 48502
             Lisa M. Szafranic, MARTENSON, HASBROUCK & SIMON, 100 Galleria Parkway, NW, Ste., 1500,
             Atlanta, GA 30339
             Honorable David M. Lawson, United States District Judge